# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| MED-TRANS CORPORATION, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-cv-01139 |
| | § | |
| BLUE CROSS AND BLUE | § | |
| SHIELD OF FLORIDA, INC. and | § | |
| C2C INNOVATIVE SOLUTIONS, | § | |
| INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## ORIGINAL COMPLAINT

Plaintiff Med-Trans Corporation ("Med-Trans") files this Original Complaint against Defendants Blue Cross and Blue Shield of Florida, Inc. ("Florida Blue") and C2C Innovative Solutions, Inc. ("C2C") and would respectfully show the Court as follows:

## INTRODUCTION

1.    Med-Trans files this case to vacate an Independent Dispute Resolution ("IDR") arbitration award made by federal contractor C2C pursuant to the No Surprises Act ("NSA"), which selected Florida Blue's purported Qualifying Payment Amount ("QPA") as the appropriate out-of-network payment for a 58-mile air ambulance transport.  The award was secured

through undue means and misrepresentations by Florida Blue and the application of a standard that violates federal law by C2C.[1]

2.     The NSA took effect on January 1, 2022.  It is implemented and enforced by the combined efforts of the U.S. Departments of Labor, Health and Human Services, and the Treasury (the "Departments"), which together issued interim and then final rules to create an unprecedented, mandatory federal arbitration process to determine pricing for all out-of-network ("OON") emergency air ambulance transports of patients who are covered by commercial insurance.  As part of that federal arbitration process, the Departments created a list of only eleven approved IDR entities (one of which is no longer accepting new disputes).[2]  There is virtually no information available to the parties to evaluate the competency or quality of the various entities.  If the parties to the proceeding do not agree on which IDR entity to use, the Departments appoint one for them.  Under the NSA, the IDR entity's decision is binding on the parties unless there has been a misrepresentation of fact to the IDR entity or it meets the requirements to be vacated under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a).

3.     On January 23, 2022, Med-Trans provided critical emergency air transport to a gunshot victim, transporting him on a helicopter specially

---

[1] Med-Trans has filed a sister lawsuit against C2C and another Blue Cross affiliate, Capital Health Plan, Inc. ("Capital Health"), alleging similar bad-faith conduct.

[2] https://www.cms.gov/nosurprises/help-resolve-payment-disputes/certified-idre-list

configured for medical transport, and providing continuous medical care by a crew of specially trained medical professionals throughout the 58-mile trip. The emergent nature and medical necessity of the transport were never at issue – only the price to be paid for the transport.

4. The patient was insured through Florida Blue, an insurer with which Med-Trans is OON.  Florida Blue allowed $11,172.67 on the claim, which it later claimed to be its QPA.  A QPA is supposed to represent the *median* rate for contracted in-network services.  The purported QPA does not reflect market realities and, upon information and belief, does not comply with the statutory requirements of the NSA.

5. The improperly-calculated QPA amount is only one part of the bad faith scheme Florida Blue contrived to minimize payment on the OON claim. It first issued an Explanation of Benefits ("EOB") for the claim that did not comply with multiple requirements under federal law, including disclosure of its purported QPA for the trip.  The EOB also made material misrepresentations regarding the nature of the claim and claim payment. Florida Blue next concealed from Med-Trans in the IDR process information it was required under federal law to disclose, including the purported QPA for the trip and details on how it was calculated.

6. When Med-Trans and Florida Blue failed to agree on the selection of an arbitrator, the Departments assigned C2C to them.  Florida Blue then

submitted what it claimed to be its QPA to C2C (still concealing it from Med-Trans).  However, the submission of that QPA was a misrepresentation of fact because the QPA had not been calculated in accordance with federal requirements.  An anonymous person at C2C reviewed the parties' submissions and applied an illegal presumption in favor of the QPA, thereby violating the NSA and rewarding Florida Blue for its bad faith scheme and multiple violations of federal law.

7.      Med-Trans hereby seeks to vacate the award and requests the Court to enter an order directing a rehearing with due process protections.

## PARTIES

8.      Plaintiff Med-Trans Corporation is a North Dakota corporation with its principal place of business in Texas.  Med-Trans provides air ambulance services in states around the country, including Florida.

9.      Defendant Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue) is a Florida corporation with its principal place of business in Jacksonville, Florida.

10.     Defendant C2C is a Texas corporation with its principal place of business in Jacksonville, Florida.

## VENUE AND JURISDICTION

11.     The NSA creates a right to judicial review of awards issued in IDR proceedings.  *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).  Venue is proper under

28 U.S.C. § 1391(b) because both defendants reside in Florida and at least one resides in this judicial district.  It is also the district in which the award was made.  9 U.S.C. § 10(a).

12.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1331, the NSA and its implementing regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201, because this matter requires the Court to interpret and apply the NSA and its implementing regulations, and because 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) expressly authorizes judicial review under the circumstances at issue herein.

## FACTUAL BACKGROUND

13.    The air ambulance industry plays an integral role in the American healthcare system.  Air ambulances often serve as the only lifeline connecting critically ill and injured patients to healthcare, particularly in rural areas. They transport trauma, stroke, heart attack, and burn patients and other emergent cases requiring critical care.  Without air ambulances, more than 85 million Americans would not be able to reach a Level 1 or 2 trauma center within an hour when emergency care is needed.

14.    The delivery of on-demand, life-saving air ambulance services in emergencies requires substantial investments in specialized aircraft, air bases, technology,  personnel, and regulatory compliance systems.  In this particular case, Med-Trans's investment in helicopter air ambulances proved vital to

rendering timely medical care.  On January 23, 2022, a patient who was out hunting with a group was shot with a 12-gauge shotgun.

15.    At the time, the patient was located in Mayo, Florida, a sparsely populated part of Florida.  Because a trauma center was not available locally, emergency transport was requested to move the patient to a hospital in Gainesville.

16.    The patient in question had been shot while hunting and needed immediate, specialized care.  Med-Trans answered the call, transporting the patient on a medically equipped helicopter and administering continuous medical care throughout the 58-mile trip.

**The No Surprises Act and Federal Independent Dispute Resolution Proceedings.**

17.    The NSA became effective January 1, 2022.  There are sections of the NSA that are unique to air ambulance transports because air ambulance transports are covered by the Airline Deregulation Act and are not subject to state rate regulation.  Broadly speaking, the NSA requires patient cost-sharing for emergency OON claims to be the same as for in-network claims.  That said, insurers are allowed to initially pay to the OON provider whatever amount they deem appropriate (or nothing at all).  If they make an OON payment that is too low, a provider must first attempt to negotiate a higher one.  If negotiations fail, a provider must submit the dispute to the IDR process.

During this process, the IDR entity (a federal contractor), without a hearing, must select one of the two offers submitted based on the position statements submitted by the parties.

18.   The Departments created a list of only eleven approved IDR arbitration entities (one of which is no longer accepting new disputes). There is no meaningful information available to the parties to evaluate the competency or quality of the various IDR entities. No information is provided about the specific qualifications of the employees of the IDR entities who actually decide the appropriate OON rate for a transport. If the parties to the arbitration do not agree on an IDR entity to use, the Departments appoint one for them.

19.   C2C is a medical appeals company headquartered in Jacksonville, Florida. Its primary business is providing second level Medicare appeals or reconsiderations for Medicare Parts A and B. It also performs reconsiderations of adverse determinations and redeterminations for covered drug benefits under Medicare Part D. In 2022, it began accepting IDR disputes between payors and providers under the NSA.

20.   C2C currently charges $349 per IDR dispute. This is the amount it receives no matter how much, or how little, time it spends on the dispute. The statute contains no requirements for what the person actually deciding the dispute is paid or the amount of time that must be spent reviewing the

submissions or weighing the evidence. The person at C2C who actually reviews the position statements and renders the award is not required to disclose his or her identity or qualifications.

21.  The award is made without a hearing or exchange of written submissions between the parties. Accordingly, neither party is allowed the opportunity to respond to the other's submission. The way the Departments have implemented the No Surprises Act results in a black -box approach where decisions can be made without rhyme or reason. Judicial review of IDR proceedings is therefore essential to ensure that providers like Med-Trans receive due process and are not subject to bad faith schemes and unlawful decision making.

22.  Med-Trans and its affiliates have prevailed in a substantial majority of the disputes decided through the IDR process. Many of the reasoned awards they have received explain how the credible evidence submitted supports the OON payment requested.

23.  To date, Med-Trans and its affiliates have lost every dispute the Departments have submitted to C2C, which does not provide reasoned awards but rather selects the payment offer that is closest to the QPA, an amount that is supposed to represent a payor's median rate for contracted in-network services. Unsurprisingly, this is always the payor's offer.

24.     The NSA requires arbitrators to consider certain categories of information in determining the appropriate OON rate. *See* 42 U.S.C. § 300gg-112(b)(5)(C) (Considerations in determination).[3]  The QPA is only one such piece of information.  *Id.* at § 300gg-112(b)(5)(C)(i).  The QPA is defined in the NSA as the "median of the contracted rates recognized by the plan or issuer" "for the same or a similar item or service" offered in the same insurance market and in the same geographic region as of January 31, 2019, increased by the consumer price index.  *Id.* at § 300gg-111(a)(3)(E)(i).  By regulation, a health plan can calculate its QPA using only rates it has "contractually agreed to pay a . . . provider of air ambulance services for covered items or services," expressly excluding any "single case agreement, letter of agreement, or other similar arrangement  .  .  .  for a specific participant or beneficiary in unique circumstances" as "not constitu[ting] a contract."  45 C.F.R 149.140(a)(1).[4]  If a plan or issuer does not have at least three in-network contracts for a service, the QPA may be determined based on information from a third-party database.  *Id.* § 149.140(c)(3)(i).

---

[3] The No Surprises Act amended the Internal Revenue Code, the Employee Retirement Income Security Act (ERISA), and the Public Health Service Act (PHS Act).  All three statutory amendments are substantively identical.  Accordingly, for sake of brevity, citations to NSA requirements are to the PHS Act, 42 U.S.C. 300gg et seq.).

[4]  The regulations regarding how the QPA may be calculated are currently being disputed by the air ambulance industry.  *See, e.g., Assoc. of Air Medical Servs. v. U.S. Dept. of Health and Human Servs. et al.*, Case No. 1:21-cv-3031 in the United States District Court for the District of Columbia (filed 11/16/21).

25.    The NSA enumerates additional information that must be considered:

- the quality and outcomes measurements of the provider that furnished the services;

- the acuity of the individual receiving the services or the complexity of furnishing such services to such individual;

- the training, experience, and quality of the medical personnel that furnished the services;

- ambulance vehicle type, including the clinical capability level of such vehicle;

- population density of the pick-up location (such as urban, suburban, rural, or frontier); and

- demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider and the plan or issuer, as applicable, during the previous 4 plan years.

42 U.S.C. § 300gg-112(b)(5)(C)(ii).  Furthermore, the IDR entity must consider any further information related to an offer and submitted by a party.  *Id.* at § 300gg-112(b)(5)(B)(ii).

**The Illegal Presumption in Favor of the QPA.**

26.    The Departments originally jointly published an Interim Rule that compelled IDR entities to apply a rebuttable presumption that the QPA was the appropriate OON rate.  Arbitrators were required to select the offer closest to the QPA unless a provider overcame the presumption with credible evidence.

This "thumb on the scale" approach was held illegal in litigation filed by the Texas Medical Association ("TMA") on behalf of physicians and facilities. *See Tex. Med. Ass'n v. United States Dep't of Health & Human Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879 at *15 (E.D. Tex. Feb. 23, 2022). Subsequently, in a related lawsuit, the same federal court invalidated the Departments' illegal presumption as it applied to air ambulance transports. *See Lifenet Inc. v. U.S. Dept. of Health & Human Servs., et al.,* No. 6:22-cv-00162-JDK, 2022 WL 2959715 at *10 (E.D. Tex., June 26, 2022)(vacating final sentence of 45 C.F.R. § 149.520(b)(2) requiring additional information submitted by parties "demonstrate that the qualifying payment amount is materially different from the appropriate out-of-network rate").

27.   The claim at issue herein was decided on September 12, 2022, more than two months after the illegal presumption in favor of the QPA was invalidated. Accordingly, C2C was required to consider all of the facts and circumstances of the payment dispute and select the offer that best represented the value of the air ambulance services provided to Florida Blue's member. The QPA was merely one data point, and should have had little relevance to this analysis, especially if Florida Blue failed to provide any evidence to show

how its QPA was calculated or how it specifically related to the transport at issue.[5]

28.     The Final Rule, issued after the IDR decision at issue herein was made, did not adopt the QPA presumption from the Interim Rule.  The Final Rule states that "IDR entities should select the offer that best represents the value of the item or service under dispute after considering the QPA and all permissible information submitted by the parties." 87 Fed. Reg. 52,618 (August 26, 2022) at 52,628.

**Florida Blue Violates the NSA and Conceals in Bad Faith the Alleged QPA.**

29.     By regulation, insurers are required to include with each initial payment or denial the insurer's QPA for each item or service involved.  *See* 45 C.F.R. § 149.140(d)(1)(i).  Insurers must also certify that each QPA was determined in compliance with federal requirements.  *Id.* § 149.140(d)(1)(ii)(A)-(B).  As the Departments have explained:

> The Departments seek to ensure ***transparent and meaningful disclosure*** about the calculation of the QPA while minimizing administrative burdens on plans and issuers. These interim final rules therefore ***require that plans and issuers make certain disclosures***

---

[5] For example, an insurer can calculate a QPA for use in Florida based on contracts it has for air ambulance providers in Florida, Georgia, South Carolina, Virginia, West Virginia, Delaware, Maryland or Washington, D.C. (the South Atlantic Census Division). Accordingly, the QPA for a Florida transport could be based on in-network contracts with small, regional air ambulance providers that have no operations in Florida and could not possibly have performed the transport in question.  Such a QPA has little bearing on the appropriate OON rate for a transport in Florida with a large air ambulance provider like Med-Trans, which has significantly invested in bases across Florida so that life-saving transports in the state can actually occur.

> ***with each initial payment*** or notice of denial of payment, and that plans and issuers ***must provide additional information upon request*** of the provider or facility.

86 Fed. Reg. 36,898 (July 13, 2021) (emphasis added).

30.     Florida Blue was also required by regulation to "provide a statement that if the provider or facility, as applicable, wishes to initiate a 30-day open negotiation period for purposes of determining the amount of total payment, the provider or facility may contact the appropriate person or office to initiate open negotiation, and that if the 30-day open negotiation period does not result in a determination, generally, the provider or facility may initiate the IDR process within 4 days after the end of the open negotiation period."  45 C.F.R. § 149.140(d)(1)(iii).   Florida Blue was further required to "provide contact information, including a telephone number and email address, for the appropriate office or person to initiate open negotiations for purposes of determining an amount of payment (including cost sharing) for such item or service." *Id.*

31.     On April 24, 2022, Florida Blue issued an EOB for the transport. It "allowed" $11,172.67 and paid only $7,928.96 after deducting what it termed "patient responsibility."  Florida Blue did not make *any* of the disclosures required by law, including the amount of its QPA for each item or service involved, and it did not certify that it had calculated each QPA in compliance with the NSA.

32.    EOB disclosures are supposed to "serve to direct providers or facilities to the federal IDR process if the parties cannot agree on an out-of-network rate." 86 Fed. Reg. 36,899 (July 13, 2021).  But Florida Blue's EOB failed to inform Med-Trans of the availability of the IDR process to challenge its unreasonably low payment.  And its failure to disclose the QPA meant Med-Trans lacked critical evidence it needed to draft its IDR position statement.

33.    Furthermore, Florida Blue made material misrepresentations on its EOB, which was submitted to C2C.  Florida Blue deducted $3,243.71 from the total amount allowed for what it termed "patient responsibility."   But at the same time, it represented that an "[i]n network provider [was] utilized. Therefore no patient responsibility." *Id.* at 2.   But Med-Trans is not an in-network provider, and if there is no "patient responsibility," then Florida Blue had no basis for deducting the amount it did.  Florida Blue further represented that the amount paid "represents BCBSFL's maximum allowable payment." But there is no maximum allowable payment for OON providers because the payment amount is determined by the IDR entity—not Florida Blue.  Because the EOB was submitted when the IDR was initiated, these misrepresentations by Florida Blue were made to C2C.

34.    In sum, Florida Blue failed to disclose what it was statutorily required to, including the QPA.  And what it ***did*** disclose was filled with

misrepresentations.   These are just some examples of Florida Blue's bad-faith conduct, all of which was intended to minimize payment on the claim.

**Florida Blue Violates the NSA and Conceals How It Calculated Its Alleged QPA.**

35.     Med-Trans initiated the required 30-day Open Negotiation Period ("ONP") on June 2, 2022.  In its ONP notice, Med-Trans not only asked Florida Blue to disclose its QPA, but further requested the information required to be disclosed about how the QPA was calculated.   By regulation, Florida Blue should have disclosed to Med-Trans the following:

- information about whether the QPA includes contracted rates that were not set on a fee-for-service basis for the specific items and services at issue;

- whether the QPA for items and services was determined using underlying fee schedule rates or a derived amount;

- whether a related service code was used to determine the QPA for a new service code and, if so, information to identify which related service code was used;

- whether an eligible database was used to determine the QPA and, if so, information to identify which database was used to determine the QPA; and

- whether the plan's or issuer's contracted rates include risk-sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments for the items and services involved that were excluded for purposes of calculating the QPA.

See 45 C.F.R. § 149.140(d)(2).  As the Departments explain, disclosing this type of information "better inform[s] the open negotiation and IDR process."

36.     In response to Med-Trans's request, Florida Blue did provide some information regarding how it calculates QPAs.  For instance, it represented that "the QPA was calculated using Florida Blue's in-network rates as of January 31, 2019."  It also stated that "[f]or entities where there was not a fixed reimbursement for the given CPT/HCPCS code on the underlying fee schedule, an amount *was derived utilizing a representative set of claims* and in-network contracted rates as of January 31, 2019."  *Id.* (emphasis added).  Florida Blue also asserts that it utilized  a "statewide geographic area" in calculating the QPA.  *Id.*

37.     But Florida Blue did not provide Med-Trans all of the information requested or required.  It did not disclose what its QPA was on the EOB or during the ONP.  And it provided no information on how the "representative set of claims" was selected, how this sample was used to "derive" reimbursement rates, or what the in-network contracted rates were as of January 31, 2019.  Florida Blue instead kept the details on how it calculates QPAs strictly under wraps.

**Florida Blue Submits a Purported QPA to C2C, Which Applied the Illegal Presumption In Capital Health's Favor.**

38.     After having violated federal law by concealing the QPA and details regarding its calculation from Med-Trans, Florida Blue then submitted a purported QPA to C2C.  Florida Blue claimed the QPA for the transport at

issue was $6,684.05 for the base rate and $4,488.62 for mileage, a total of $11,172.67 (the amount allowed on the EOB).

39.     Certain payors are not properly calculating the QPA in accordance with the regulations, a fact the Departments have acknowledged.   For instance, the Departments concede that payors are not properly calculating QPAs for providers in the "same or similar specialty."   DEP'TS, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021*, Implementation Part 55 at pp. 16-17 (Aug. 19, 2022) available at https://perma.cc/B7L7-QEKM.   They also concede that payors sometimes calculate the QPA by including contracts that have $0 listed for a service, thereby artificially depressing the QPA.   The Departments have stated that this practice is improper.  *Id.* at 17 n.29.

40.     Med-Trans and its affiliates were OON with Florida Blue in 2019. However, they provided Florida Blue beneficiaries with many air ambulance transports that year.   Florida Blue's average allowed OON rate (base and mileage) for these 2019 Florida trips was much higher than its purported QPA.

41.     Med-Trans has contracted rates for air ambulance services in Florida.   Its contracted rates are also much higher than the purported QPA. Florida Blue did not disclose the in-network rates upon which its QPA is purportedly based.

- 17 -

42.     Compared to Florida Blue's historical allowed OON rate, and Med-Trans's own in-network rates, Florida Blue's alleged QPA—$11,172.67—is ***improbably*** low.  Upon information and belief, Florida Blue's QPA does not comply with the statutory requirements of the NSA.  Upon information and belief, Florida Blue therefore submitted in bad faith to C2C a QPA that did not comply with federal law and thereby made a misrepresentation of fact to C2C that it had been provided the QPA for the claim.

**C2C Applies the Illegal Presumption In Florida Blue's Favor.**

43.     Below is the sum total of the reasoning provided by C2C in selecting the QPA as the appropriate payment for the flight at issue:

> The IDRE has received offers from both parties. The QPA in this instance for code A0431 was $6,684.05 and for code A0436 was $4,488.62. The final offer submitted by the initiating party was $23,414.06 for code A0431, which is ***522 percentage of the QPA*** and $13,103.94 for code A0436, which is ***196 percentage of the QPA***. ***The final offer by the noninitiating party was $13,700.00 for code A0431, which is 205 percentage of the QPA and $5,336.00 for code A0436, which is 119 percentage of the QPA***.

> As noted above, the IDRE must consider related and credible information submitted by the parties to determine the appropriate OON rate. As set forth in regulation, additional credible information related to certain circumstances was submitted by both parties. ***However, the information submitted did not support the allowance of payment at a higher OON rate.***

C2C applied an illegal presumption in favor of the QPA, selecting the offer closest to the QPA and requiring Med-Trans to prove that "a higher OON rate" than the QPA was warranted.

## FLORIDA BLUE'S AWARD SHOULD BE VACATED AND THE DISPUTE RESUBMITTED FOR A NEW IDR DETERMINATION

44.    The NSA allows a district court to vacate an arbitration award in the following four circumstances:

(1)    where the award was procured by corruption, fraud, or undue means;

(2)    where there was evident partiality or corruption in the arbitrators, or either of them;

(3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42 U.S.C. § 300gg–111 (c)(5)(E)(1) (adopting the standards found at 9 U.S.C. § 10(a)(1)).  In addition, an IDR decision is not binding on a party where there is evidence of misrepresentation of facts presented to an IDR entity regarding the claim, such as an improperly calculated QPA.  *Id.*  The IDR award in favor of Florida Blue should be vacated under all five of these grounds.

45.    Florida Blue secured the award through undue means and misrepresentations of fact to C2C.  It withheld from Med-Trans, in violation of federal law, information it was required to disclose and that Med-Trans needed in order to adequately prepare its arbitration submission and final payment offer.  It made its initial misrepresentation of facts on the EOB issued for the

claim, which was provided to C2C.   Then, it misrepresented the facts by submitting a purported QPA that was not properly calculated under federal law.   These actions were taken in bad faith and to secure an undue advantage in the IDR process.

46.   Also, C2C revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers by using an illegal presumption in favor of the undisclosed QPA.   As demonstrated by C2C's short award, Florida Blue's payment offer prevailed solely because it was the closest to the QPA.   An anonymous person at C2C calculated the offers as a percentage of the QPA, selected the one closest to the QPA, and stated that the submitted information "did not support the allowance of a payment at a higher OON rate."   Such a presumption in favor of the QPA is precisely what federal law prohibits.

47.   The FAA permits this Court not only to vacate an award but to "direct a rehearing by the arbitrators" so long as the parties' agreement does not preclude it.   9 U.S.C. § 10(b).   Here, there is no agreement between the parties and thus nothing precluding a rehearing.   Furthermore, nothing in the NSA prevents a court from providing appropriate relief such as a rehearing when it vacates an IDR award.   Merely vacating the IDR award without directing a rehearing in accordance with the proper standards under the NSA would provide Med-Trans no relief at all, as only a rehearing can result in a higher payment under the new federal regulatory scheme created by the NSA.

48.    This case raises substantial issues of federal law relating to how the QPA may be permissibly calculated under the NSA and its implementing regulations, the proper interpretation of the NSA with respect to what constitutes a misrepresentation of fact to an IDR entity, the proper interpretation of the NSA with respect to whether IDR awards are enforceable where such misrepresentations of fact have occurred, and the proper remedy under the NSA and its implementing regulations where a payor has withheld material information from a provider.   It also concerns the due process requirements for review of decisions made by IDR entities, including the relationship between the NSA, which created a compelled process administered by a governmental agency, and the FAA, which governs voluntary agreements made between private parties

49.    In particular, IDR proceedings are unlike private arbitrations. Med-Trans did not voluntarily agree to arbitrate its payment dispute.  It is required by federal law to participate in IDR proceedings in order to try to obtain fair compensation for its services.  The Departments assigned their preferred Medicare review company, C2C, to this dispute.   Unlike the traditional "rank and strike" procedure used by arbitration services such as the American Arbitration Association, Med-Trans did not select and had no input in selecting the arbitrator (C2C) or the individual who actually decided the dispute, who remains anonymous to this day.   And unlike private

arbitrations, Med-Trans was not provided any discovery and did not receive a reasoned award. Indeed, the award makes no mention of the specific, credible evidence submitted by Med-Trans in support of a higher payment.

50.    Due process requires more. Med-Trans provided a life-saving transport and is entitled to a fair adjudication of the amount of its payment.

## REQUEST FOR RELIEF

51.    Med-Trans requests that the Court vacate the arbitration award at issue and declare that: 1) Florida Blue made a misrepresentation of fact to C2C when it submitted what it represented was its QPA for the claim; 2) Florida Blue procured the IDR award at issue through misrepresentations and undue means; and 3) by applying an illegal presumption in favors of the QPA, C2C revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

52.    Med-Trans further requests that the Court direct C2C to rehear this claim, to implement a new briefing schedule so that Med-Trans can submit a new position statement and new offer, and to assure that Med-Trans receives due process by rendering a reasoned decision in accordance with the requirements of the NSA, upon consideration of all evidence submitted by the parties that relates to an offer, and without a presumption in favor of the QPA.

53.     Med-Trans further requests its attorney's fees and costs, and any

other just and proper relief.

Dated:  October 21, 2022

SMITH HULSEY & BUSEY

By:   *s/ Lanny Russell*
         Lanny Russell

Florida Bar No. 303097
One Independent Drive, Suite 3300
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
lrussell@smithhulsey.com

NORTON ROSE FULBRIGHT US LLP

*/s/ Adam T. Schramek*
Adam T. Schramek, Lead Counsel
Texas Bar No. 24033045
98 San Jacinto Boulevard
Suite 1100
Austin, TX  78701-4255
Telephone:  (512) 474-5201
Facsimile:   (512) 536-4598
adam.schramek@nortonrosefulbright.com
*Pro Hac Vice Pending*

Abraham Chang
Texas Bar No. 24102827
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:  (713) 651-5151
Facsimile:   (713) 651-5246
abraham.chang@nortonrosefulbright.com
*Pro Hac Vice Pending*

*Attorneys for Med-Trans Corporation*